**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SANDRA BENSON, | : | CIVIL CASE NO. |
|         Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| | : | |
| CITY OF BRIDGEPORT | : | |
|         Defendant. | : | DECEMBER 3, 2020 |

## COMPLAINT

**I.**      **PRELIMINARY STATEMENT**

1.     This action seeks declaratory, injunctive and equitable relief, and compensatory and costs and attorney fees for the discrimination suffered by the plaintiff when the defendant terminated the plaintiff's employment on account of the plaintiff's disability in violation of the provisions of the Americans With Disabilities Act as amended by the ADA Amendments Act Of 2008, and the provisions of the Connecticut Fair Employment Practices Act.

2.     Additionally, this action seeks declaratory, injunctive and equitable relief, compensatory and punitive damages, and costs and attorney fees, pursuant to Title VII of the Civil Rights Act of 1964, as amended, and Title 42 U.S.C. § 1981 for the race,

1

color and gender discrimination to which she was subjected by the defendant when it terminated her employment on account of her race and color.

II.    **JURISDICTION**

3.    This suit is brought and jurisdiction lies pursuant to Section 107(a) of the Americans With Disabilities Act (hereinafter "ADA"), Title 42 U.S.C. §12117, which incorporates by reference Section 706 of Title VII of the Civil Rights Act of 1964, as amended, Title 42 U.S.C. §2000e-5.

4.    This action also arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. §1981a.

5.    Further this action is brought pursuant to the provisions of Title 42 U.S.C. §1981.

6.    Also, this action is being pursued pursuant to the provisions of the Connecticut Fair Employment Practices Act, Connecticut General Statutes § 46a-58 et seq.

7.    Jurisdiction over the plaintiff's federal claims is invoked pursuant to Title 28 U.S.C. § 1331, Title 28 U.S.C. §1343(a)(3), Title 28 U.S.C. §1343(a)(4) and Title 42 U.S.C. §2000e-5(f).

8.    The court possesses supplemental jurisdiction over the plaintiff's state law claims.

1.    All conditions precedent to jurisdiction pursuant to Section 107a of the Americans with Disabilities Act, Title 42 U.S.C. §12117 and Title VII of the Civil Rights Act

2

of 1964, as amended, have occurred or have been complied with in the following manner:

    a.  A charge of employment discrimination on the basis of disability, race and color was filed on February 13, 2020, with the State of Connecticut Commission on Human Rights and Opportunities, which filing was within 300 days of the commission of the unlawful employment practice alleged herein.

    b.  Simultaneous with the filing of the plaintiff's complaint with the State of Connecticut Commission on Human Rights and Opportunities, a charge of employment discrimination on the basis of disability, race and/or color, was filed with the Equal Employment Opportunity Commission on or about February 13, 2020, which filing was within 300 days of the commission of the unlawful practice alleged herein.

    c.  By letter dated November 19, 2020, the Equal Employment Opportunity Commission issued to the plaintiff a "Dismissal and Notice of Rights," a copy of which is attached to this complaint and labeled Exhibit 1.

       d.  On November 18, 2020, the Connecticut Commission on Human Rights and Opportunities issued a release of jurisdiction, a copy of which is attached to this complaint, and designated Exhibit 2.

9.     Costs and attorney fees may be awarded pursuant to Title 42 U.S.C. §2000e-5(k) and Title 42 U.S.C. §1988.

10.    Declaratory, injunctive, and equitable relief is sought pursuant to Title 28 U.S.C. §2201, 2202 and Title 42 U.S.C. §2000e-5(g).

11.    Compensatory damages are sought pursuant to Title 42 U.S.C. §1981a.

## III.   VENUE

12.    This action properly lies in the District of Connecticut pursuant to Title 28 U.S.C. §1391(b) because the claim arose in this judicial district, and pursuant to Title 42 U.S.C. §2000e-5(f) (3), because the unlawful employment practices were committed in this judicial district.

## IV.   PARTIES

13.    The plaintiff, whose color is Black, is an African American citizen of the United States, residing in the state of Connecticut.

14.     The defendant, city of Bridgeport, is a municipal corporation organized and existing under the laws of the State of Connecticut and is a political subdivision of the State of Connecticut.

15.     The defendant is an employer which engages in an industry affecting commerce and, upon information and belief, employs more than fifteen regular employees.

16.     The defendant is a person within the meaning of Section 701(a) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(a).

17.     The defendant is an employer within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(b).

18.     The defendant, city of Bridgeport, is an employer within the meaning of the provisions of the Americans with Disabilities Act.

19.     The defendant, city of Bridgeport, is a person within the meaning of Section 101c of the Americans With Disabilities Act, Title 42 U.S.C. §12111(7) and Section 701(a) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(a).

20.     The defendant, city of Bridgeport, is an employer within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(b).

21.     The defendant, city of Bridgeport, is an employer as that term is defined by Title 42 U.S.C. §12111(5) in that the defendant engages in an industry affecting commerce and

has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

22. The plaintiff had been employed by the defendant in the state of Connecticut.

23. All the discriminatory employment practices alleged herein were committed within the state of Connecticut.

24. The defendant, city of Bridgeport, is an employer within the meaning of Connecticut General Statutes § 46a – 51 (10).

**V.    STATEMENT OF FACTS**

25. The plaintiff suffers from a mental disability as that term is defined in Connecticut General Statutes § 46a-51(20), in that the plaintiff "has a record of, and/or is regarded as having one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders."

26. The plaintiff has been professionally diagnosed as suffering from bipolar disorder, depression, and anxiety.

27. The plaintiff suffers from a mental impairment as that phrase is defined under the provisions of the Americans with Disabilities Act, as amended, Title 42 U.S.C. 12101 et seq.

28.   The National Institutes of Health describes "bipolar disorder," also known as manic-depressive illness, as "a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks."

29.   On January 25, 2016, the defendant hired the plaintiff to work as a receptionist/secretarial assistant in the Office of the City Attorney.

30.   On August 10, 2016, the defendant formally appointed the plaintiff to the position of Secretarial Assistant in the City Attorney's Office for the City of Bridgeport, effective August 1, 2016.  *Exhibit 3.*

31.   On May 3, 2018, the defendant placed the plaintiff on administrative leave because of a workplace dispute over the frequency the plaintiff's use of the restroom facilities.

32.   On May 4, 2018, the City Attorney for the city of Bridgeport, who served as the plaintiff's overall supervisor, provided the plaintiff with a letter in which he stated that the plaintiff would not be subject to any discipline because her conduct was the result of her medical condition for which she had already been approved for FMLA intermittent leave.

33.   On May 4, 2018, the plaintiff was prepared to return to work, when the defendant forced the plaintiff to undergo a psychological fitness for duty examination on May 15, 2018.

7

34.     On June 5, 2018, the plaintiff was informed of the results of the psychological fitness

        for duty examination, *Exhibit 4,* which concluded, without legitimate factual basis,

        that because the plaintiff "has already demonstrated work-related problems that have

        been identified by several supervisors and coworkers," she was not fit to return to

        work, since "her workplace problems are outgrowths of her psychiatric condition."

35.     Dr. Arnold D. Holzman ("Holzman"), the psychologist performing the psychological

        fitness for duty examination on the plaintiff, failed to consider the plaintiff's stable

        and non-problematic employment history with the defendant from her date of hire,

        January 25, 2016, to the date of the examination, May 15, 2018.

36.     Holzman failed to consider the culpability of the plaintiff's co-workers in the "several

        problematic incidents at the workplace" in which the plaintiff was involved.

37.      Holzman, in reaching his conclusion about the plaintiff's fitness for duty, erroneously

        inferred that the plaintiff was the party who caused the "several problematic incidents

        at the workplace."

38.     In opining that the plaintiff was not fit for employment, Holzman ignored the

        plaintiff's capable job performance for approximately two years and nine months,

        overcoming her mental impairments in capably performing the essential functions of

        her job.

8

39.   On June 28, 2018, the defendant, without any discussion with the plaintiff about available workplace accommodations, summarily terminated the plaintiff's employment.

40.   The plaintiff admits that she suffers from mental impairments, but she denies that she is unable to perform the essential functions of her job if accommodated, as she had demonstrated over the preceding two years and nine months.

41.   On July 5, 2018, the defendant reinstated the plaintiff to her position.

42.   On September 21, 2018, the defendant, using the threat to terminate the plaintiff's employment, forced her to sign a "Last Chance Agreement," *Exhibit 5,* in which she agreed that if she "violate[s] ANY of the City's work rules/regulations or policies and/or exhibit unruly, disruptive, insubordinate or unacceptable behavior [her] employment with the City of Bridgeport will be terminated."

43.   On September 29, 2018, the plaintiff was transferred from her position in the Office of the City Attorney to the Community Service Division of the Bridgeport Police Department.

44.   From September 29, 2018, to May 22, 2019, the plaintiff performed her duties in a capable manner.

9

45.   The plaintiff's office was a "shared space" with another employee of the defendant, Maureen Harris ("Harris"), who worked for the Bridgeport Police Department Office of the "victim"'s Advocate.

46.   On May 22, 2019, the plaintiff became the subject of the abusive conduct of another employee of the defendant, Harris, and a non-employee friend of Harris.

47.   On May 22, 2019, Harris and her non-employee friend, came over to the plaintiff's cubical where she was working and instructed her to leave her workspace so that they could allegedly interview a civilian ""victim"."

48.   Neither Harris, nor her friend had supervisory authority over the plaintiff, nevertheless they ordered the plaintiff to leave her workplace.

49.   There were other office facilities within the community service division headquarters for Harris to conduct confidential interviews with "victim"s.

50.   The plaintiff explained to Harris and her friend that she worked for the police department and was at her assigned desk in the office she shared with Harris.

51.   The plaintiff suggested to Harris that she use the unoccupied conference room to conduct her confidential interview with the "victim".

52.    Harris was unreasonable in insisting that the plaintiff, not Harris, would have to leave the shared space, even though Harris, unlike the plaintiff, had an alternative space available to her.

53.    The plaintiff was set upon by Harris, Harris' friend, and the "victim", in a most degrading manner, verbally assaulting her in their efforts to have the plaintiff leave her office.

54.    The plaintiff, attempted to avoid any confrontation with Harris, and discussed with her supervisor, Police Officer Sandy Quinonez, Harris' instructions that she leave her office space.  *Exhibit 6.*

55.    Officer Quinonez instructed the plaintiff to return to her workspace and inform Harris, Harris' friend and the "victim" that the office is shared space, and that they have no right to force the plaintiff to leave her office.  *Exhibit 6.*

56.    Officer Quinonez also told the plaintiff that she should inform Harris that if she needed to discuss a matter in confidence with the "victim", she should use the conference room.  *Exhibit 6.*

57.    The plaintiff returned to her office and related to Harris the instructions the plaintiff had received from Officer Quinonez.  *Exhibit 6.*

11

58.   Despite being informed of  Officer Quinonez's instructions, Harris, her friend, and the "victim" continued to intimidate the plaintiff in their effort to force her to leave her office space. *Exhibit 6.*

59.   Harris' friend, refusing to acquiesce to Officer Quinonez's admonition, confronted Officer Quinonez, and argued with her about returning the plaintiff back to the plaintiff's office space. *Exhibit 6.*

60.   Officer Quinonez explained to Harris' friend that the plaintiff's office was shared space, and that the conference room was available for Harris' use if she needed confidentiality to interview the "victim". *Exhibit 6.*

61.   Harris' friend returned to the plaintiff's workspace whereupon she yelled and screamed at the plaintiff because the plaintiff would not leave her workspace.

62.   Officer Quinonez prepared a formal report for her supervisor in which she fully corroborated the facts as alleged by the plaintiff and exculpated the plaintiff from any wrongdoing. *Exhibit 6.*

63.   Being traumatized by the harassing and intimidating conduct of Harris, her friend, and the "victim", the plaintiff requested that she be allowed to leave work for the remainder of the day, which Officer Quinonez approved. *Exhibit 6.*

64.    Harris then had the "victim" file a false allegation that the plaintiff had assaulted her by grabbing her arm. *Exhibit 6.*

65.    After thorough investigations, Officer Quinonez, and Officer Nick Ortiz unequivocally concluded that the plaintiff had not assaulted the "victim". *Exhibits 6.*

66.    Despite the independent, objective report of Officer Quinonez, and Officer Nick Ortiz, which absolved the plaintiff of any culpability in the harassing conduct of Harris, and her friend, the defendant, on May 24, 2019, placed the plaintiff on administrative leave pending an investigation of the May 22, 2019, incident.

67.    On January 9, 2020, the defendant terminated the plaintiff's employment based on the report of Philip J. White ("White"), Senior Labor Relations Officer, which relied solely on the false allegations of Harris, her friend, Albina Venhinha ("Venhinha"), and the "victim." *Exhibit 7.*

68.    White's report completely disregarded the objective, non-biased reports of Officer Quinonez and Officer Ortiz.

69.    White relied on the false statements of Harris, Vendinha, to  circumvent the plaintiff's due process rights, and instead charge her with a violation of the last chance agreement, justifying her summary termination.

13

70.    The defendant terminated the plaintiff's employment because of her record of treatment for her mental impairments.

71.    The defendant terminated the plaintiff's employment because it regarded her as being mentally disabled.

72.    The defendant  terminated the plaintiff's employment because of her mental disability.

73.    As of May 24, 2019, the plaintiff was capable, both physical and mentally, of performing the essential functions of her receptionist/secretarial position.

74.    The plaintiff suffers from a long-term mental impairment.

75.    The plaintiff's mental impairment substantially limits her major life activities of working, interacting with others, and sleeping, among others.

76.    The plaintiff was fully capable and qualified to perform the essential duties of her position.

77.    The defendant terminated the plaintiff's employment because of her mental disorder.

78.    The plaintiff was at all times able to perform the essential functions of her job.

79.    Although the plaintiff was fully capable of performing the essential functions of her job, the defendant terminated her employment because of her disability.

14

80.   But for the plaintiff's mental disorder, the defendant would not have terminated the plaintiff's employment.

81.   But for the plaintiff's record of treatment for her mental disorder, the defendant would not have terminated her employment.

82.   But for the defendant regarding the plaintiff as suffering from a mental disorder, it would not have terminated her employment.

83.   Harris treated the plaintiff in a racially demeaning and discriminatory manner when she instructed the plaintiff to vacate her office on May 22, 2019, and maliciously filed false charges against the plaintiff.

84.   But for the plaintiff's race and color, Harris would not have filed false charges against the plaintiff.

85.   But for the race and color discrimination that Harris harbored against the plaintiff, the plaintiff would not have been terminated from her position.

86.   Harris has a history of treating her non-white co-workers in a discriminatory manner, leaving other, non-white employees to leave their employment instead of working alongside Harris.

87.   But for the plaintiff's color and race, the plaintiff would not have been terminated from her position.

15

88.  White's findings regarding the plaintiff's alleged wrongdoing was based on race and color bias of White when he gave credence to Harris' false allegations over the report of two police officers, and the testimony of the plaintiff.

89.  The termination of the plaintiff's employment was based on the false and racially discriminatory accusations of Harris.

90.  The plaintiff has suffered financially as a result of the defendant's discriminatory conduct.

91.  The plaintiff has suffered emotional distress as a result of the defendant's discriminatory conduct.

## VI.  **FIRST CAUSE OF ACTION (VIOLATION OF THE AMERICANS WITH DISABILITIES ACT)**

92-182.  Paragraphs 1 through 91 are incorporated herein as paragraphs 92 through 182 of this First Cause of Action.

183.  The defendant, city of Bridgeport, was fully aware of the plaintiff's mental disorder prior to terminating the plaintiff's employment.

184.  The plaintiff is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, as amended, in that the plaintiff suffers from a

16

mental impairment which substantially limits one or more of her major life activities, including working, interacting with others, and sleeping.

185.   The plaintiff is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, as amended, who, with a reasonable accommodation, was fully capable of performing the essential functions of her position.

186.   The defendant, city of Bridgeport, terminated the plaintiff's employment because the plaintiff was afflicted with a mental disorder which substantially limited several of her major life activities including work, interaction with others, and sleeping.

187.   The defendant, city of Bridgeport, terminated the plaintiff's employment because it regarded the plaintiff as suffering from a disabling mental impairment.

188.   The termination of the plaintiff's employment by the defendant, city of Bridgeport, because she was afflicted with a mental impairment is a discriminatory action prohibited by the provisions of the Americans with Disabilities Act, as amended.

189.   The termination of the plaintiff's employment by the defendant, city of Bridgeport because it regarded the plaintiff as suffering from a disabling mental impairment is a discriminatory action prohibited by the provisions of the Americans with Disabilities Act, as amended.

17

190.   As a result of his mental impairment, the plaintiff was substantially limited in performing several major life activities including the major life activities of work, interacting with others, and sleeping.

191.   The plaintiff at all times relevant herein is an individual with a disability within the meaning of the Americans with Disabilities Act, as amended.

192.   The plaintiff is a qualified individual with a disability as that term is defined under the provisions of the Americans with Disabilities Act, as amended.

193.   Although the plaintiff's condition limits him in the performance of several major life activities, including work, interacting with others, and sleeping, he is able and would be able to perform the essential functions of her job, secretarial assistant.

194.   The defendant, city of Bridgeport, discriminated against the plaintiff with malice and with a reckless indifference to the federally protected rights of the plaintiff guaranteed to the plaintiff by the provisions of the Americans with Disabilities Act, as amended.

195.   The discriminatory actions of the defendant, city of Bridgeport, has caused, continues to cause and will cause the plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

196.   The discriminatory actions of the defendant, city of Bridgeport, have caused the plaintiff to suffer emotional distress.

18

**VII.**   **SECOND CAUSE OF ACTION (VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT – DISABILITY DISCRIMINATION)**

197-287.   Paragraphs 1 through 91 are incorporated herein as paragraphs 197 through 287 of this Second Cause of Action.

288.   The defendant's, city of Bridgeport's termination of the plaintiff's employment because the plaintiff was suffering from a mental impairment is a discriminatory act prohibited by the provisions of the Connecticut Fair Employment Practices Act.

289.   The defendant, City of Bridgeport, was fully aware of the plaintiff's mental impairment prior to terminating the plaintiff's employment.

290.   The plaintiff suffers from a mental impairment within the meaning of the Connecticut Fair Employment Practices Act, and was fully capable of performing the essential functions of the position of secretarial assistant.

291.   The defendant, city of Bridgeport, terminated the plaintiff's employment because the plaintiff was afflicted with a mental impairment as defined by the provisions of the Connecticut Fair Employment Practices Act.

292.   The defendant, city of Bridgeport, terminated the plaintiff's employment because the defendant, city of Bridgeport, regarded the plaintiff as suffering from a disabling

mental impairment as defined in the most recent edition of the American Psychiatric

Association's Diagnostic and Statistical Manual of Mental Disorders.

293.   The termination of the plaintiff's employment by the defendant, city of Bridgeport,

because she was afflicted with a mental impairment is a discriminatory act prohibited

by the provisions of the Connecticut Fair Employment Practices Act.

294.   The termination of the plaintiff's employment by the defendant, city of Bridgeport,

because it regarded the plaintiff as suffering from a disabling mental impairment, as

defined in the most recent edition of the American Psychiatric Association's

Diagnostic and Statistical Manual of Mental Disorders, is a discriminatory act

prohibited by the provisions of the Connecticut Fair Employment Practices Act.

295.   The plaintiff is able to perform the duties of a secretarial assistant.

296.   The defendant, city of Bridgeport, discriminated against the plaintiff with malice and

with a reckless indifference to the federally protected rights of the plaintiff guaranteed

to the plaintiff by the provisions of the Connecticut Fair Employment Practices Act.

297.   The discriminatory actions of the defendant, city of Bridgeport, has caused, continues

to cause and will cause the plaintiff to suffer substantial damages for future pecuniary

losses, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

298.   The discriminatory actions of the defendant, city of Bridgeport, have caused the plaintiff to suffer emotional distress.

299.   The defendant, city of Bridgeport, discriminated against the plaintiff on account of her disability with malice and with a reckless indifference to the state protected rights of the plaintiff.

300.   Connecticut General Statutes § 46a-51(9) defines the term employee as "any person employed by an employer but shall not include any individual employed by his parents, spouse or child, or in the domestic service of any person."

301.   Connecticut General Statutes § 46a-59(10) defines " 'employer' as any person or employer with three or more persons in his employ."

302.   Connecticut General Statutes § 46a-59(20) defines "mental disability" as referring "to an individual who has a record of, or is regarded as having one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's 'Diagnostic and Statistical Manual of Mental Disorders.'"

303.   Connecticut General Statutes Section § 46a-60(a)(1) prohibits "an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or

21

privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability, including, but not limited to, blindness."

304.   The plaintiff is an employee as that term is defined by Connecticut General Statutes § 46a-59(9).

305.   The plaintiff suffers from a mental disability as that term is defined by Connecticut General Statutes § 46a-59(20).

306.   The defendant, city of Bridgeport, regarded the plaintiff as suffering from a mental disability as that term is defined by Connecticut General Statutes § 46a-59 (20).

307.   The termination of the plaintiff's employment by the defendant, city of Bridgeport, because it regarded the plaintiff as being mentally disabled is a violation of the provisions of Connecticut General Statutes § 46a-60(a) (1).

308.   The termination of the plaintiff's employment by the defendant, city of Bridgeport, as secretarial assistant, on account of the plaintiff's mental disability is a violation of the provisions of Connecticut General Statutes § 46a-60(a) (1).

**VIII.**   **THIRD CAUSE OF ACTION (Violation of Title VII of the Civil Rights Act of 1964, as amended)**

22

309-399.   The plaintiff incorporates as if re-alleged paragraphs 1 through 91.

400.   The defendant discriminated against the plaintiff because of her race and color when it terminated her employment.

401.   The defendant was motivated by the plaintiff's race and color when it terminated the plaintiff's employment.

402.   Title VII of the Civil Rights Act of 1964, as amended explicitly prohibits discriminatory practices based on race, color and/or gender.

403.   Because the plaintiff's race and color were motivating factors and made a difference in the decision by the defendant to terminate the plaintiff's employment, the defendant violated the provisions of Title VII of the Civil Rights Act of 1964, as amended.

404.   The defendant engaged in race and color discrimination against the plaintiff with malice or reckless indifference to the plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

405.   The plaintiff had successfully performed the duties of a secretarial assistant while employed by the defendant.

406.   The plaintiff remains qualified to perform the duties of a secretarial assistant in the defendant's employment.

407.   As a result of the discriminatory acts of the defendant, the plaintiff has suffered a substantial loss of income.

408.   As a result of the discriminatory acts of the defendant, the plaintiff has suffered emotional distress.

**IX.**   **FOURTH CAUSE OF ACTION (Violation of Title 42 U.S.C. § 1981)**

409-499.   The plaintiff incorporates as if re-alleged paragraphs 1 through 91.

500.   The defendant discriminated against the plaintiff because of her race and color when it terminated her employment.

501.   But for the plaintiff's race and color, the defendant would not have terminated the plaintiff's employment.

502.   Because the plaintiff's race and color were determinative factors in the decision by the defendant to terminate the plaintiff's employment, the defendant violated the provisions of Title 42 U.S.C. §1981.

503.   The plaintiff had successfully performed the duties of a secretarial assistant while employed by the defendant.

504.   The plaintiff remains qualified to perform the duties of a secretarial assistant.

505.   As a result of the discriminatory acts of the defendant, the plaintiff has suffered a substantial loss of income.

24

506. As a result of the discriminatory acts of the defendant, the plaintiff has suffered emotional distress.

507. The defendant engaged in discrimination against the plaintiff with malice or reckless indifference to the plaintiff's rights under Title 42 U.S.C. §1981.

**X.**     **FIFTH CAUSE OF ACTION (VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT)**

508-598.   Paragraphs 1 through 91 are incorporated herein as paragraphs 508 through 598 of this Second Cause of Action.

599. The defendant's, city of Bridgeport's termination of the plaintiff's employment because of the plaintiff's race and color is a discriminatory act prohibited by the provisions of the Connecticut Fair Employment Practices Act.

600. The defendant, city of Bridgeport, terminated the plaintiff's employment of her race and color.

601. The termination of the plaintiff's employment by the defendant, city of Bridgeport, because of her race and color is a discriminatory act prohibited by the provisions of the Connecticut Fair Employment Practices Act.

602. The plaintiff is able to perform the duties of a secretarial assistant.

603. The defendant, city of Bridgeport, discriminated against the plaintiff with malice and with a reckless indifference to the federally protected rights of the plaintiff guaranteed to the plaintiff by the provisions of the Connecticut Fair Employment Practices Act.

604. The discriminatory actions of the defendant, city of Bridgeport, has caused, continues to cause and will cause the plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

605. The discriminatory actions of the defendant, city of Bridgeport, have caused the plaintiff to suffer emotional distress.

606. The defendant, city of Bridgeport, discriminated against the plaintiff on account of her race and color with malice and with a reckless indifference to the state protected rights of the plaintiff.

607. Connecticut General Statutes § 46a-51(9) defines the term employee as "any person employed by an employer but shall not include any individual employed by his parents, spouse or child, or in the domestic service of any person."

608. Connecticut General Statutes § 46a-59(10) defines " 'employer' as any person or employer with three or more persons in his employ."

609. Connecticut General Statutes Section § 46a-60(a)(1) prohibits "an employer, by himself or his agent, except in the case of a bona fide occupational qualification or

26

need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability, including, but not limited to, blindness."

610.   The plaintiff is an employee as that term is defined by Connecticut General Statutes § 46a-59(9).

611.   The termination of the plaintiff's employment by the defendant, city of Bridgeport, as secretarial assistant, because of her race and color is a violation of the provisions of Connecticut General Statutes § 46a-60(a) (1).

**XI.**   **PRAYER FOR RELIEF (As to All Causes of Action)**

**WHEREFORE, THE PLAINTIFF PRAYS THAT THIS COURT:**

a.   declare the conduct engaged by the defendant to be a violation of the plaintiff's rights;

b.   enjoin the defendant from engaging in such conduct;

c.   award the plaintiff equitable relief in the form of back salary and fringe benefits from the date of the termination of the plaintiff's employment as secretarial

27

assistant, plus interest as allowed by law until paid in full, together with front salary and benefits accrual;

d.   reinstate the plaintiff to the position he held with the defendant as secretarial assistant;

e.   award the plaintiff compensatory damages;

f.   award the plaintiff costs and attorney fees; and

g.   grant such other and further relief as the Court may deem just and proper.

**THE PLAINTIFF REQUESTS A TRIAL BY JURY**.

THE PLAINTIFF – SANDRA BENSON

BY/s/ Thomas W. Bucci
 Thomas W. Bucci
Fed. Bar #ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
1000 Bridgeport Avenue
Suite 501
Shelton, CT 06484
Tel: (203) 366-3939
Fax: (475) 269-2907
Email: thomaswbucci@outlook.com

28

PLAINTIFF'S
EXHIBIT

ALL-STATE LEGAL®

**1**

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:   **Sandra Benson**
      **285 Laurel Avenue**
      **Bridgeport, CT 06605**

From:   **Boston Area Office**
        **John F. Kennedy Fed Bldg**
        **15 New Sudbury Street, Room 475**
        **Boston, MA 02203**

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16A-2020-00636** | **Amon L. Kinsey, Jr.,** **Supervisory Investigator** | **(617) 865-3672** |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ]   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X]   Other *(briefly state)*       **Charging Party is pursuing claims in another forum.**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

November 19, 2020

_____
**Feng K. An,**
**Area Office Director**

*(Date Mailed)*

Enclosures(s)

cc:

        **CITY OF BRIDGEPORT**
        **999 Broad Street**
        **Bridgeport, CT 06604**

**Thomas W. Bucci, Esq.**
**WILLINGER WILLINGER & BUCCI, P.C.**
**855 Main Street**
**Bridgeport, CT 06604**



# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Sandra Benson
COMPLAINANT

CHRO No. 2020360

vs.

EEOC No.  16A-2020-00636

City of Bridgeport
RESPONDENT

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint.  The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides.  If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

DATE: November 18, 2020

Tanya A. Hughes, Executive Director

mrm
Service:    **VIA EMAIL ONLY**
Complainant: Sandra Benson,  sandra8083@gmail.com
Complainant's Counsel: Thomas W. Bucci, tbucci@wwblaw.com
Respondent's Attorney: Robert Mitchell, rbmitchell@mitchellandsheahan.com

PLAINTIFF'S
EXHIBIT
3
ALL-STATE LEGAL®



*CITY OF BRIDGEPORT, CONNECTICUT*
## CIVIL SERVICE COMMISSION

CITY HALL * 45 LYON TERRACE * BRIDGEPORT, CONNECTICUT 06604-4023 * (203) 576-7103 * Fax 576-7102

Commissioners
LEONOR GUEDES
President

DAVID J. DUNN
Personnel Director

T. WALTER PLUMMER-Vice Pres.
SALVATORE V. EMANUEL, JR.
RICHARD P. RODGERS
MELVA FALBERG

August 10, 2016

Sandra Benson
285 Laurel Avenue
Bridgeport, CT 06605

Dear Ms. Benson,

I am pleased to offer you the position of Secretarial Assistant in the City Attorney's Office for the City of Bridgeport. This position offers an annual salary of $40,158.00 for a 35 hour work week, which will be paid to you on a weekly basis.

Your start date will be retroactive to August 1, 2016. This employment is subject to the provisions of the Charter of the City of Bridgeport and the rules and regulations of the Civil Service Commission.

The Secretarial Assistant position is affiliated with the National Association of Government Employees. You will be entitled to a package of health, life insurance and leave benefits as outlined in the union contract. Your continued employment will be conditional upon completion of a six (6) probationary period.

Should you agree to accept this position on these terms, please sign below and return a copy of this letter to Eric Amado at the following address: City of Bridgeport, Civil Service Office, 45 Lyon Terrace, Room 106, Bridgeport, CT 06604. Upon acceptance, please contact Eric Amado at (203) 337-2300 for an appointment so that any necessary paperwork can be completed.

Thank you for all your hard work and commitment to the City of Bridgeport.

Sincerely,

David J. Dunn
Personnel Director

Sandra Benson

cc:    R. Christopher Meyer, City Attorney
       John Bohannon, Deputy City Attorney

BEHAVIORAL HEALTH CONSULTANTS, LLC

PLAINTIFF'S
EXHIBIT
4
ALL-STATE LEGAL®

3018 Dixwell Avenue
Hamden, CT 06518
Tel: (203) 288-3554
Fax: (203) 281-0235

Arnold D. Holzman, Ph.D., ABPP

## FITNESS FOR DUTY EVALUATION

Name:             Sandra Benson
Date of Birth:
Date of Evaluation: May 15, 2018
Employer:         City of Bridgeport
                  Office of the City Attorney

Preamble:

The purpose of this evaluation is to determine the above named employee's psychological fitness for duty. This report is to be considered a medical record for purposes of handling in accordance with state and federal privacy laws. Although supervisors and managers may be told about necessary restrictions on the work or duties of the employee and about necessary accommodations, other information contained in this report should be treated as confidential and afforded the protections usually given to personal health information in the workplace.

Contemporary standards of privacy pertaining to the communication of individually identifiable health information require that the examiner disclose only the minimum necessary information to satisfy the purpose of the disclosed authorization. This comprehensive report will only include those findings that are directly relevant to the conclusions stated in the report regarding the employee's psychological fitness for duty. If the findings or recommendations are challenged in any adjudicative or administrative forum, all undisclosed information will be made available to the parties as necessary.

In compliance with statutory requirements and practice standards regarding the retention of psychological services records, the full record related to this examination will be retained for a minimum of seven years before disposal.

Reason for Evaluation:

Sandra Benson is a 35-year-old single female referred by the Department of Labor Relations of the City of Bridgeport for a fitness for duty evaluation. Prior to the onset of the evaluation, Ms. Benson was provided with a disclosure and informed consent statement that she was asked to read and sign. The function of this document was to inform Ms. Benson of the purpose, scope, and methods of the examination, limits of confidentiality, potential outcomes and uses of the evaluation, payment for services, and access to the report of findings and conclusions.

Ms. Benson signed the consent form and expressed an understanding of its contents. Ms. Benson also signed an authorization to use and disclose protected health information.

## Work History:

As noted Above Ms. Benson has been a secretarial assistant of the City of Bridgeport office of the city attorney since January 2015. Whereas she came to this job with relatively little experience she apparently progressed well initially. The above noted incidents document the many job-related problems she has had.

## Psychosocial History:

Ms. Benson is single. She lives with her six year old daughter, her parents and younger brother in her parents' home. She reported that she grew up as the oldest of three siblings in an intact family. She has a 32-year-old brother who is a physician, still in training. She reported that six years ago her youngest brother died due to kidney cancer. She reported that he was sick for two years before succumbing.

Ms. Benson reported that she and her family immigrated to the United States from Nigeria when she was 11 years old. She reported that they moved directly to Bridgeport and although they switched residences they have lived in Bridgeport throughout. She reported that her initial impressions after relocating to Bridgeport were that her peers were much more poorly controlled in their behavior. She reported that her family was more structured and that she experienced harsher discipline during her developmental years.

She reported that she had a long-term relationship with her daughter's boyfriend until soon after she became pregnant. According to her report they continue to maintain a good, non-romantic, relationship. Of note, although asked about recent stresses, she did not reveal the above noted arrest for domestic violence or any other relationship stresses.

Ms. Benson reported that she is educated through the high school diploma plus two years of college majoring in fashion design at the University of Bridgeport. She reported that she left college after two years due to her brother's illness. It is not clear why but she reported that she had to obtain employment rather than go to school.

## Current Stressors:

Ms. Benson denied any significant current life stressors. She described her most significant concerns as being a single parent with a desire to move out of her parents' house. As noted above she reported that she gets along with her daughter's father. Her only complaint was that she experiences him as immature and she attributed this as the reason the relationship ended.

She denied any significant developmental stressors that could be having an enduring impact on her current functioning. However when discussing her brother's death, which occurred six years

ago, she quickly became tearful and indicated that she as well as members of her family continue to have difficulty coping with his death.

<u>Substance Use History:</u>

Ms. Benson reported that she is an infrequent social user of alcohol. She denied a more significant history of alcohol use. She denied any past history of other substance use.

<u>Mental Status Examination</u>

*Appearance, Attitude and Activity.* Ms. Benson presented for this evaluation as well dressed and made up. She appeared to participate in this evaluation in a superficially open, non-defensive manner. She reported no significant mental status complaints during the course of the interview.

*Mood and Affect.* Ms. Benson's affect appeared to be slightly labile as evidenced by her quickly becoming tearful when discussing the death of her brother six years ago. Her mood and affect were well controlled other than this instance. She described her mood as better during recent months. She acknowledged occasional sadness but denied other symptoms of depressive disorder such as loss of interest, impact on socialization, energy level or cognitive functions. She did not report any problems with poorly controlled behavior or mania. She acknowledged long-standing sleep disorder characterized by sleep onset insomnia.

Regarding anxiety she described herself as someone who worries a lot particularly about her daughter's future. She denied the experience of panic attacks however reported that her "heart occasionally races" when thinking about her now deceased brother.

*Speech and Language.* Ms. Benson's speech was grammatically correct and coherent. The quality of her speech was consistent with observed mood and level of educational attainment.

*Thought Process, Thought Content, and Perception.* Ms. Benson did not evidence any indications of delusions, hallucinations, tangential thought processes or any other manifestations of psychotic thought process.

*Cognition.* Ms. Benson was oriented to time, place and person. Intellectual abilities, although not formally assessed, appeared to be consistent with her educational attainment. There were no observed impairments in attention or concentration. Cognitive processes were at the abstract level of thinking.

Insight & Judgment. Ms. Benson's judgment is considered impaired. During the course of this evaluation she failed to acknowledge or minimized her role in her interpersonal conflicts, both work related and not.

<u>Psychiatric History:</u>

Ms. Benson reported that she has been in psychiatric treatment for approximately one year with Dr. Udoyen and with a different unspecified psychiatrist prior to this. According to Ms. Benson she is currently prescribed Ativan which is being tapered and BuSpar for anxiety. She is also

prescribed Wellbutrin which is being tapered and Lexapro for depression and Lamictal, a mood stabilizer. Finally she is prescribed Belsomra for sleep by her primary care physician. This is consistent with medical records reviewed.

Review of the records of Dr. Udoyen indicates a diagnosis of Bipolar Disorder characterized primarily by mood lability, poor frustration tolerance as well as occasionally feeling her deceased brother's "presence." His records also document that she has been resistant to engaging in psychotherapy.

Medical records from St. Vincent's Medical Center confirm her May 4, 2018 admission due to suicidal statements. She was admitted for one day and discharged on May 5. Review of those records indicate a history of mood lability. She texted a friend and co-worker regarding her suicidal ideation however she denied sending evidence of it on her phone noted by a responding police officer. These records also confirm a history of two previous psychiatric admissions, in July 27-31, 2017 for psychiatric complaints and at age seventeen following an overdose. These records do not indicate whether it was intentional.

Ms. Benson reported that until recently she was also receiving psychotherapy from an unspecified clinician, however that is belied on the notes of Dr. Udoyen in which he reports that he has encouraged her to participate in therapy but she has failed to follow through. Finally she reported that she just completed three visits with Nancy Legow, PhD of this office as part of her EAP benefit. Dr. Legow confirmed these visits.

<u>Interview:</u>

As noted above Ms. Benson presented for this evaluation in a calm and a superficially cooperative manner. She initially described an incident in which she was criticized by her superviso          for what Sandra described as talking with another coworker too much and taking too many bathroom breaks. She reported that she took a phone call and after the phone call her supervisor again came to question her about her excessive bathroom use. Her supervisor then asked the director.          o speak with Sandra. Sandra reported that at that time she texted          and requested to take the rest of the day off. He agreed however her direct supervisor,          agreed that she would take time off without pay. She reported that she became emotional as she was getting ready to leave and while talking with two other coworkers. She reported that she cried and raised her voice. This was apparently Ms. Benson's description of the May 1, 2018 incident documented above.

She reported that while home she texted a coworker indicating that she was upset. She acknowledged that she stated in that text that she wished she were dead but did not report on the exact wording of the text. She reported that following the text the next day the chief of police, whom she knew from the mayoral campaign, came to her house for a wellness check. At the time she was at another doctor's office however she spoke with the chief via phone and reassured him that she was okay. She reported that soon thereafter police and an ambulance came to that doctor's office and took her to the hospital. She reported that she stayed overnight, stating that this was because there was no doctor to evaluate her until the next day. She reported that she was discharged and next day and told to follow up with her psychiatrist.

## Psychometric Assessment:

The Minnesota Multiphasic Personality Inventory-2RF (MMPI-2RF) is a comprehensive and objective psychological questionnaire designed to evaluate personality and psychopathology. Her approach to this measure was one in which she attempted to present herself in a very positive light by denying even minor faults and shortcomings that most people readily acknowledge. This level of virtuous self-presentation is uncommon. She also presented herself as extremely well-adjusted. This reported level of psychological adjustment is also rare in the general population. Due to her test taking approach any absence of elevation on the substantive scales needs to be interpreted with caution. The resulting substantive scale profile did not show any significant elevations however as noted above her approach to this test minimized the possibility of clinically relevant findings.

The Millon Clinical Multiaxial inventory-IV (MCMI-IV) is another objective psychological questionnaire that is designed to evaluate possible characterological contributions to problematic behavior. Ms. Benson's profile on this measure shows evidence of personality dysfunctions. The profile generated by her responses to the items on this measure is indicative of individuals who tend to create difficult interpersonal relationships and have unrealistic expectations for themselves. This profile indicates a strong need for excitement seeking and participating in challenges which most others would not attempt. Furthermore regarding relationships, it is likely that few of her relationships will be long-lasting. Individuals in those relationships that have endured longer, and perhaps have become more involved, will become drained by her unpredictability. As her friends show waning interest, she may become more absorbed by and concerned about maintaining their continued support and commitment. If rejection becomes imminent, she may shift between excited exuberance and irritability.

## Conversation with Current Treater:

Nancy Legow, Ph.D. saw her for three visits on a self-referral basis through the Employee Assistance Program. Dr. Legow was of the opinion that her principle source of problems related to features of personality disorder including narcissistic and histrionic traits.

A phone conversation was held with Dr. Udoyen on May 18. His report confirmed the information provided in his medical records and acknowledged his diagnosis of bipolar disorder.

## Analysis and Conclusions:

Sandra Benson is a 35 year old female referred by the city of Bridgeport, Office of the City Attorney to determine her fitness for duty. Ms. Benson has been an employee since January 2015. During the course of her employment she has exhibited several problematic incidents at the workplace characterized primarily by interpersonal conflicts with coworkers and supervisors, poor management of her emotions primarily when being counseled or disciplined, episodes of insubordination as well as possible manipulative use of physical symptom complaints. She has had difficulty responding appropriately to redirection at the workplace. She will typically become argumentative, attempt to monopolize the conversation followed by an avoidance of

work ostensibly attributable to physical complaints. This pattern has been ongoing on an occasional basis for approximately 2 years and has apparently worsened recently.

She has had one arrest for domestic violence and at least two brief psychiatric admissions. In these cases her self report attempted to redirect blame away from herself or minimized the seriousness.

The first question is whether there is evidence of any mental illness that is the source of her difficulties functioning successfully at the workplace. It is clear that Ms. Benson presents with behavioral and emotional adjustment problems. Review of history, results of interview and psychometric assessment suggest the presence of an acute mental disorder, Biploar Disorder diagnosed by her treating physician. In addition there are clear indications of personality disorder characterized by narcissistic or histrionic features. Bipolar Disorder is typically characterized by mood lability, poor frustration tolerance, possibly impulse control problems or alternatively unexplained depressive episodes. Individuals with personality disorders tend to cope poorly with stressors and they also tend to create interpersonal turmoil. Minor conflicts or disagreements can become exaggerated and problem solving is very difficult.

The second question is whether her symptoms will interfere with her ability to function successfully at the workplace. Ms. Benson has already demonstrated work-related problems that have been identified by several supervisors and coworkers. Considering the nature of her psychiatric presentation it is clear that her workplace problems are outgrowths of her psychiatric condition.

Considering all the above it is my impression that the current nature and severity of her symptoms substantially interfere with her capacity to function successfully at the City Attorneys Office of the city of Bridgeport and she is therefore **NOT FIT TO RETURN TO WORK**.

Thank you for allowing me the opportunity to provide this evaluation. Please feel free to contact me with any questions or concerns about this evaluation.

Arnold D. Holzman, Ph.D., ABPP
Board Certified Clinical Psychologist



PLAINTIFF'S EXHIBIT

5

ALL-STATE LEGAL®

# SANDRA BENSON
## LAST CHANCE AGREEMENT

The parties to this Agreement are the City of Bridgeport (hereinafter the "City"), NAGE, Local R1-200 (hereinafter the "Union") and Sandra Benson (hereinafter "Employee").

Whereas, Employee has repeatedly engaged in and exhibited insubordinate, antagonistic, disruptive and/or unacceptable behavior in the workplace for which she has been counseled and/or disciplined, and

Whereas, all parties hereto agree that the City had and/or has just cause for the termination of Employee's employment based upon her unacceptable behavior and conduct, and

Whereas, Employee desires one last chance to reinstate and/or retain her employment with the City of Bridgeport, and

Whereas, in consideration of the reinstatement of Employee's employment on the terms and conditions set forth in this Agreement, Employee and the Union expressly waive and forego any grievances, appeals or other legal action in connection with any adverse employment action previously taken by the City against Employee, and

Whereas, notwithstanding the foregoing and in lieu of the prior termination of Employee's employment, the parties to this Agreement hereby agree to the following terms and conditions to allow the Employee reinstatement and/or return to employment with the City of Bridgeport:

## General Conditions

1. All parties understand and agree that the Employee is being given this Last Chance Agreement in lieu of termination of employment for unacceptable conduct and/or behavior in the workplace.

2. Employee agrees to adhere to ALL City work rules, regulations and policies and behave in a professional, appropriate and acceptable manner in the workplace.

3. Should the Employee violate ANY of the City's work rules/regulations or policies and/or exhibit unruly, disruptive, combative, insubordinate or unacceptable behavior the Employee's employment with the City of Bridgeport will be terminated.

4. This Last Chance Agreement shall remain in effect for a two (2) year period commencing with the execution date of this Agreement.

5. The parties agree that Employee and the Union shall withdraw, refrain from filing and/or forego with prejudice any grievances, claims, complaints, administrative action(s), civil action(s) or any other legal action(s) of any kind related to any adverse employment action taken by the City prior to the date of this Agreement, and that Employee shall furnish Employer with a valid and duly executed General Release waiving, relinquishing and releasing any and all claims and/or actions of any kind against the City of Bridgeport and/or its officials, employees, agents, servants or representatives in any way arising from or related to her employment.

## Conditions of Reinstatement

6. Within 14 days of all parties signing this Agreement the employee shall be reinstated to City employment in the position of Secretarial Assistant (G453) in the Bridgeport Police Department Records/Property Division at the annual starting salary of $42,566.00.

7. The time lapse if any between the Employee's termination and first day of re-employment and/or return to work in accordance with this Agreement will be converted to administrative leave with pay. Said period of administrative leave shall be counted towards the accrual of any City benefits, employment time and/or seniority.

8. This Agreement must be signed by all parties. If this Agreement remains unsigned after September 21, 2018 this Agreement shall be null and void.

## EAP Counseling

9. The employee is encouraged, but not required, to utilize the services of the City of Bridgeport's Employee Assistance Program (EAP).

10. The Employee acknowledges receipt of a copy of a pamphlet describing the Employee Assistance Program offered by the City.

## Consequences of Future Violations

11. Employee's violation of the terms and conditions of this Agreement while in force and effect shall vest management with absolute and unfettered authority to immediately terminate Employee's employment. The City's acquiescence to any misconduct or violation of this Agreement by Employee on any given occasion(s) shall in no way change or diminish the City's right(s) pursuant to this Agreement, or in any way prevent the City from exercising

its right(s) to terminate Employee's employment for violating the terms and conditions of this Agreement.

12. Should the Employee violate any City work rules and/or regulations, policies or any of the terms and/or conditions of this Agreement, her employment with the City of Bridgeport will be terminated.

## Arbitration

13. The parties agree that in the event Employee is charged with violating any City work rule, regulation, policy or term or condition of this Agreement, Employee shall be entitled to and be provided a pre-disciplinary hearing. If Employee is terminated or otherwise disciplined following the opportunity to be heard at the pre-disciplinary hearing, such termination or other discipline shall NOT be arbitrable, except to determine whether the charged behavior and/or event prompting the termination or other disciplinary action occurred.

## Voluntary Agreement

14. Employee freely and voluntarily enters into this Last Chance Agreement. By signing this Agreement, she acknowledges that she has read and understands the meaning and intent of the Agreement and she further acknowledges that prior to signing this Agreement she has had the assistance and advice of her Union representatives and/or legal counsel, and/or that she knowingly and freely waived her right to avail herself of such advice or representation. The Employee agrees that she will hold harmless the City and its agents from any liability or cause of action, known or unforeseen, which may arise from the administration and enforcement of this Agreement.

## Acknowledgements

15. Employee acknowledges that she has been fully and fairly represented by the Union in all disciplinary and/or employment related matters including but not limited to the terms and conditions of this Agreement.

16. Any occasion(s) or incidence(s) in which the City refrains from exercising, or only partially exercises, its rights under this Agreement in any particular way shall not be or constitute a waiver of the City's right to exercise its rights in the future in such manner as the City shall determine at its sole discretion.

17. This Agreement shall not constitute a practice or precedent under the collective bargaining agreement between the City and the Union. Neither the Union nor the Employee will cite or otherwise utilize this Agreement or any of its terms in any grievance, arbitration (either grievance or binding interest) or any proceeding except for such proceeding to enforce the terms and conditions of this agreement.

Wherefore, the following parties and/or authorized representatives have executed this Agreement on the date indicated beneath his/her respective signature.

FOR THE CITY                FOR THE UNION                EMPLOYEE

_____     _____     _____
Janene Hawkins              James Meszoros              Sandra Benson
Labor Relations Officer     President,
                            NAGE, Local R1-200

_____     _____     _____
Date                        Date                        Date
                                                        9/21/18



PLAINTIFF'S
EXHIBIT
6
ALL-STATE LEGAL®

Bridgeport Police Department
## OFFICE OF COMMUNITY SERVICES

1395 Sylvan Avenue • Bridgeport, Connecticut 06606 • Telephone (203) 576-8278 • Fax 332-0307

May 23, 2019

JUN 27'19 ᴘᴍ2:03 COMM REL

Sir,

     The following incident occurred on Wednesday, May 22, 2019 at the Bridgeport Police Community Services Division, between the Victim Advocate employee, Maureen Harris, office secretary Sandra Benson and a non-city employee, Bienna. This statement will be completed in chronological order with approximate times.

     **1351 hrs**: An unidentified victim and his mother had an appointment with Sgt Phil Sharp and Ret Detective Harold Dimbo at our office. I was approached by the victim's mother who stated she was kicked out from the first floor by an older lady (Maureen Harris) because she had a victim with her and she needed the privacy. She said Ms. Harris advised them to either wait outside or to go to the second floor to wait for Sgt Sharp and Mr. Dimbo. Sgt Sharp and Mr. Dimbo arrived at the office at 1430 hrs.

     **1445 hrs**: Ms. Benson came to my office located on the second floor to advise me that Ms. Harris and a non-city employee, Bienna approached her at her cubical and told her she needed to leave the office because there was a domestic violence victim in the office and they needed the privacy to speak to her. I advised Ms. Benson to go back to her office and advise Ms. Harris and "Bienna" that they can use the conference table which is located in the main room on the first floor and if there was an issue that Ms. Harris can speak to me.

     At this point I left you a message as well as a text to contact me regarding the issue in the office on the first floor.

     **1503 hrs**: I was sitting in my office wrapping up a few things when I was abruptly approached by the non-city employee, "Bienna". She invasively questioned me, "Did you send Sandra back downstairs to her desk?" I stated to her, "I did because she works in this office and unfortunately in the same office as the Victim Advocate. Please tell Maureen to use the conference table located outside their office." "Bienna" immediately raised her voice and demanded Ms. Benson be removed from the office because they were working with a victim of domestic violence and the information was sensitive as well as confidential and only the Victim Advocate can gather the information. I advised "Bienna" that she could not come to my office and demand someone who is paid by the City of Bridgeport to be removed. I also had to remind "Bienna "that she is not an employee of the city and that she was a guest in my building. She stated to me, " I am helping Maureen with the computer." She then proceeded to make threats and stated, "Captain Porter would not like it if Maureen filed a grievance!" At that point I politely asked "Bienna" to leave my office and that I was not going to tell Ms. Benson to leave the office when she is a paid city employee. "Bienna" stormed off. Sgt Sharp and Mr. Dimbo were in the office with their appointment on the second floor when incident occurred.

After my initial encounter with "Bienna", I contacted Officer Nick Ortiz via cell phone and explained to him what occurred in the office. He stated this was not the first time Mrs. Harris has done this to the past secretaries. He stated he was on his way back to the office and that he would speak to Mrs. Harris.

**1530 hrs:** Ms. Benson came to my office sobbing and stated to me, "I was kicked out for the office again by Maureen, Bienna and now the victim. I would like to go home." At that point I looked at my watch and noticed it was 1530 hrs and made the decision to send her home to alleviate the situation on the first floor. I then ran down stairs to the office where Mrs. Harris and "Bienna" were located and politely asked to see "Bienna" outside their office. "Bienna" said, "no we can discuss whatever it is you want to speak to me about in front of them!" I stated to her that I wanted to see her in the lobby because I spoke to her upstairs earlier and there was victim in their office.

Bienna walked out to speak to me and a short time later Maureen and the victim came out to the lobby and interjected in our conversation. As I was speaking to "Bienna" Mrs. Harris stated when she has a victim in the office she needs privacy because the information she is receiving is sensitive and cannot have others in the office. I explained to Mrs. Harris, "Bienna" is not a city employee so she should not be there and she should not be demanding the removal of a paid city employee. Also, advised Mrs. Harris she is in a shared space with the secretary and if she needed to speak to a victim she could have used the conference table out front or the empty office located on the second floor, which both are equipped with computers.

During the discussion with Mrs. Harris and "Bienna", the victim stated she was there when they told her to leave the office and she stated she also asked her to leave. I explained to the victim it was a shared space with both the secretary as well as the Victim Advocate. The victim proceeded to state she was approached by Ms. Benson in the office. The victim said Ms Benson grabbed her by the arm and began crying and apologizing to her. The victim stated she wanted to press charges on Ms. Benson because she felt violated. "Bienna" immediately stated, "I don't think we need to contact the police. This is getting out of hand." I asked the victim if she was hurt and if she needed medics and at that time she refused. I immediately excused myself and returned to my office and contacted you via cell phone.

During our phone conversation I explained to you the situation with all parties. You advised me to tell Mrs. Harris the office is a shared space with her and the secretary. I also explained to you the victim wanted to file a report because Ms. Benson grabbed her by the arm. You advised me to gather her information and that I would write an in house report.

I immediately went downstairs to speak to the victim and as I was gathering her information Mrs. Harris began to interject. I advised Mrs. Harris that I needed to get the information from her. As I continued to ask questions, Mrs. Harris interjected again after I told her numerous times to stop speaking. At one point the victim stated she was grabbed by Ms. Benson on the arm, and Mrs. Harris stated, "this victim was revictimized all over again!" I stated to Mrs. Harris, "Maureen please stop, we are done here. I don't need you to continue to speak over me when I am speaking to her!" After I gathered the information I returned to my office.

**1600 hrs:** Officer Nick Ortiz returned to the office. He stated he spoke to Mrs. Harris and the victim. He asked the victim when she was grabbed by Ms. Benson did she yank her out of the office, did she garb her in a threatening manner and if she was hurt. The victim stated she was not hurt but that Ms. Benson was apologizing to her as she was crying and then grabbed her arm. At no point and time was she hurt.

**Note:** I asked Ms. Benson if she grabbed the victim because she claimed Ms. Benson grabbed her by the arm. Ms. Benson stated she never touched her but that she did approach her crying and apologizing to her.

This concludes the statement in its entirety.

Respectfully,

Ofc. Sandra Quinonez #819



**Bridgeport Police Department**
# OFFICE OF COMMUNITY SERVICES
1395 Sylvan Avenue Bridgeport, Connecticut  06606 Telephone (203) 576-8278 Fax 332-0307

JUN 27'19 PM2:33 LABOR REL

To:     Captain Roderick Porter
        O.I.C, Community Service Division

From:   Police Officer Nick Ortiz
        Crime Prevention/Community Liaison

Date:   May 23, 2019

Re:     Assault complaint by

Sir,

      On May 22nd, 2019 at approximately 1500 hrs, I received a phone call from Officer Sandra Quinonez, stating that I needed to come back to the office due to a quarrel that had taken place in the Victim's advocate/Receptionist office.  Upon arrival, I entered said office and asked, "what was going on", I was immediately approached by a Hispanic female later I.D. as
               who stated she wanted to file an assault complaint against Sandra Benson who is a City of Bridgeport employee who shares office space with the Victim Advocate, Maureen Harris.

      Present in the office at the time were Officer Antoine Sistrunk, Ms. Harris, Ms. and Ms. Albina Vendinha, a friend of Ms. Harris and not employed by the city.  I then asked Ms.     , how was she assaulted, and she stated that while sitting in a chair, Ms. Benson grabbed her arm (left arm based on her description) and would not let go after repeatedly told to do so (approximately 5 times).  I then asked, if Ms. Benson tried escorting, yanking or pulling her out of the chair and her response was "no", she just kept telling her that she was sorry for what had happened to her which was the reason for her visit to the office.

      I, then stated to her that based on her statement, I did not feel an assault complaint was warranted, and it seemed more like Ms. Benson was being sensitive to her situation.  Maureen Harris and Ms. Vendinha had no comment and did not want to give statements.  At this time, I advised Ms.    : that she had no basis for an assault complaint and that Officer Quinonez was the officer responsible for filing the report on the matter.

      I, then spoke with Officer Quinonez about the incident and we both concluded that no assault took place based on either of our findings.

      The following morning, I spoke with Ms. Benson who stated that at no time did she ever put her hands on Ms.       The only thing Ms. Benson did, was tell Ms.    . how sorry she was for what had happened to her prior to her visit to the office.  I did advise Ms. Benson to write a report on the incident and to give me, Officer Quinonez and Captain Porter copies as soon as possible.  This concludes my report on the matter.

May 23, 2019

On May 22, 2019, around 2:30pm, a victim came to the office to see Maureen; Bina (Maureen's friend) was present to help Maureen with her victim. They were working in the conference room for a while before they came inside the office. I was at my desk working and they were at Maureen's desk. After a while, the victim came to my desk and requested rudely if I could leave the office because she was discussing some personal and confidential matters with Maureen and Bina. She mentioned that the last time she came to the office to talk to Maureen, I was sitting at my desk, so she went to the conference room with Maureen. I told her that I work for the department. At that point Bina and Maureen were sitting at Maureen's desk talking about me in a very unprofessional rude and mean way demanding that I leave the office. Bina came over to my desk and said that "I must leave because that's the victim assistance office." I told her that I work in the office and I don't have to leave. She mentioned again that it is not my office. I told her that she doesn't work in our office and she doesn't work for the city so therefore she should not demand that I should leave my own office. She said that she volunteers to help Maureen. I suggested to her that they should go to the conference room to work like they had done before.

At that point, my daughter's school called, and Bina told me in a very loud voice to "take my call outside the office now." Maureen was sitting at her desk and commented that she has been in this office longer that I have and therefore it isn't my office; she asked me "who I think I was." I called Captain at 2:45pm and texted him at 2:49pm to let him know what was going on. I also went upstairs to let Sandy know what was going on. I went back to my office and they continued to verbally attack me, so I decided to leave; I did not want to argue with them. On my way out, I went up to the victim and apologized to her for everything that happened, and I understood that she was frustrated. I also expressed to her that I felt sorry for her and whatever she was going through. I told her that I will leave the office for the day for them and she could stay as long as she wanted.

On my way out, I went upstairs to let Sandy know that I was going home for the day. She went downstairs with me to speak to Bina and Maureen. I went home right when we came downstairs around 3:30pm.







**ARMANDO J. PEREZ**
Chief of Police

*City of Bridgeport*
DEPARTMENT OF POLICE
OFFICE OF THE CHIEF

300 Congress Street • Bridgeport, Connecticut 06604 • Telephone (203) 581-5111 • Fax (203) 576-8130

January 9, 2020

Ms. Sandra Benson
285 Laurel Ave.
Bridgeport, CT 06605

RE: Termination of Employment

Dear Ms. Benson:

In September 2018 the City, NAGE Local R1-200 and you entered into a Last Chance Agreement to allow you to be reinstated to employment with the City. Your continued employment was contingent upon your adherence to the terms and conditions of that Last Chance Agreement.

The City has investigated a complaint of your behaviors of May 22, 2019 and determined that your actions constitute a violation of the terms of the Last Chance Agreement. Therefore, effective immediately, your employment with the City of Bridgeport is terminated.

You are instructed to return all City property including but not limited to keys, identification cards, building entry cards, phones, and computers to your supervisor, Captain Porter, forthwith. Should you have any questions regarding severance payouts, please contact the Civil Service office at 203-576-7101. Questions regarding health benefits should be directed to Ms. Monquencelo Miles at 203-576-7579.

Respectfully,

Chief A.J. Perez
Bridgeport Police Department

cc:   Eric Amado, Director, Labor Relations

Capt. R. Porter, Bridgeport Police Department
David J. Dunn, Personnel Director
Philip J. White, Senior Labor Relations Officer
Curtis Denton, ITS Director
Scott Appleby,